**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ALLIED PROPERTY AND          :
CASUALTY INSURANCE           :
COMPANY and AMCO             :
INSURANCE COMPANY,           :
                             :     CIVIL ACTION NO.
    Plaintiffs,           :     1:12-CV-01265-RWS
                             :
v.                           :
                             :
BED BATH & BEYOND, INC.,     :
and ARCH INSURANCE           :
COMPANY,                     :
                             :
    Defendants.           :

## <u>ORDER</u>

This case comes before the Court on Defendant Arch Insurance

Company's Motion for Summary Judgment [75], Plaintiffs' Motion for

Summary Judgment [76], and Defendant Bed Bath & Beyond, Inc.'s Motion for

Summary Judgment [80].  After reviewing the record, the Court enters the

following Order.

### Background

This declaratory judgment action arises out of an insurance dispute

between Plaintiffs Allied Property and Casualty Insurance Company ("Allied")

and AMCO Insurance Company ("AMCO"), and Defendants Bed Bath &

Beyond, Inc. ("BBB") and Arch Insurance Company ("Arch").  BBB was an

additional insured on insurance policies issued by Plaintiffs to Napa Home &

Garden, Inc. ("Napa") between 2009 and 2011.  BBB also had their own

primary insurance under one of Arch's liability policies.

## I.      Napa's Fuel Gel Products and Bankruptcy

Napa was a wholesale vendor that supplied gel burners and gel fuel

("Fuel Gel Products"), also known as firepots or fireburners, to various

retailers, including Defendant BBB.  (Arch's SMF, Dkt. [75-1] ¶ 4.)  BBB in

turn sold the Fuel Gel Products at its retail stores nationwide.  (Id.)  By July

2011, consumers had filed numerous lawsuits against Napa and BBB for bodily

injury and property damage resulting from explosions and fires involving

Napa's Fuel Gel Products.  (Id. ¶¶ 9-10; Pls.' SMF, Dkt. [76-2] ¶¶ 22-24.)

Facing a growing number of claims, Napa filed for bankruptcy protection on

July 5, 2011.  (Arch's SMF, Dkt. [75-1] ¶ 10.)  The bankruptcy judge later

issued an order prohibiting Plaintiffs "from disbursing payment of any kind for

claims relating to any failure of the [Fuel Gel Products], other than payment of

defense costs," pending further order by the court.  (Dkt. [76-4] at 9.)  On April

2

18, 2012, the bankruptcy judge issued an order approving a settlement agreement between Napa's bankruptcy trustee ("Napa Trustee" or "Trustee") and its insurers, Allied and AMCO, whereby the insurers paid $15.1 million to the Trustee for distribution to Napa's claimants.  (Arch's SMF, Dkt. [75-1] ¶¶ 10-11.)

## II.    Insurance Policies

The bankruptcy settlement involved a total of five insurance policies[1] that Plaintiffs issued to Napa between November 2009 and November 2011, including three primary and two umbrella policies.  (Settlement Agreement, Dkt. [76-8] at 2-3.)  Allied and AMCO's four primary Business Owner's General Liability Policies each had limits of $1 million per occurrence and $2 million in the aggregate.  (Arch's SMF, Dkt. [75-1] ¶ 1.)  The primary policies were in effect during the following periods: one Allied policy from November 17, 2009–November 17, 2010 ("2009-10 Allied Policy"),[2] and one Allied and

---

[1]The settlement acknowledges that Plaintiffs issued six policies to Napa, but the parties agreed that the claimants only brought claims under the five discussed here. (Settlement Agreement, Dkt. [76-8] at 6.)

[2]Policy No. ACP BPWC 7113714050.

3

one AMCO policy each from November 17, 2010–November 17, 2011 ("2010-11 Allied Policy"[3] and "2010-11 AMCO Policy"[4]).  (Id.)

AMCO also issued two umbrella policies from November 17, 2009–November 17, 2010 ("2009-10 Umbrella Policy"),[5] and from November 17, 2010–November 17, 2011 ("2010-11 Umbrella Policy").[6]  (Id. ¶ 2.)  Under these umbrella policies, AMCO agreed to pay for any covered loss "in excess of the total applicable limits of 'underlying insurance.' " (2009-10 Umbrella Policy, Dkt. [75-7] at 8.)  The Allied primary policies served as the underlying insurance for each policy period, and the Allied terms were incorporated into the umbrella policies.  (Id. at 6, 8.)

The 2009-10 Umbrella Policy had a limit of $5 million.  (Arch's SMF, Dkt. [75-1] ¶ 2.)  The 2010-11 Umbrella Policy initially had a limit of $5 million, but Napa requested an increase to $10 million on June 10, 2011, which became effective on June 13, 2011.  (Pls.' SMF, Dkt. [76-2] ¶ 19.)  However,

---

[3]Policy No. ACP BPWC 7123714050.

[4]Policy No. ACP BPW 7123714050.

[5]Policy No. ACP CAA 7113714050.

[6]Policy No. ACP CAA 7123714050.

4

Plaintiffs contend that the parties rescinded the increase because Plaintiffs later believed that Napa misrepresented or withheld information about the extent of its potential liability for claims related to the Fuel Gel Products.  (Id. ¶¶ 19-26; Pls.' Resp. SMF, Dkt. [83-1] ¶ 2.)

BBB was an additional insured on four of Napa's policies: the 2009-10 and 2010-11 Allied Policies, as well as the 2009-10 and 2010-11 Umbrella Policies.[7]  (Arch's Summ. J. Br., Dkt. [75-2] at 4.)  Under the terms of the policies, Allied and AMCO have a duty to defend BBB as an additional insured.[8]  Allied and AMCO further stated that their duty to defend ends once they exhaust the applicable limit of insurance.  (2009-10 Allied Policy, Dkt. [75-3] at 58; 2010-11 Umbrella Policy, Dkt. [75-8] at 13.)

---

[7]The Allied policies contained additional-insured endorsements adding BBB. (See Dkt. [75-3] at 113; Dkt. [75-5] at 98.)  The umbrella policies do not have additional-insured endorsements; rather, BBB is an additional insured on the Allied policies that underlie the AMCO umbrella policies.  (See Dkt. [75-7] at 6; Dkt. [75-8] at 9.)

[8]For example, the 2009-10 Allied Policy states, "We will have the right and duty to defend the insured against any 'suit' seeking those damages for which there is coverage under this policy." (Dkt. [75-3] at 58.)  The umbrella policies provided, "We have the right and the duty to assume control of the investigation, settlement or defense of any claim or 'suit' against the 'insured' for damages covered by this policy . . . when the applicable limit of 'underlying insurance' has been exhausted by payment of claims." (2010-11 Umbrella Policy, Dkt. [75-8] at 12.)

5

Finally, BBB was also insured under their own General Liability Policy issued by Arch from March 1, 2011–March 1, 2012 ("Arch Policy"), which likewise included a duty to defend BBB against suits for bodily injury and property damage.  (Arch General Liability Policy, Dkt. [76-33] at 27.)

## III.    Bankruptcy Terms and the Present Action

The settlement agreement between Plaintiffs and the Napa Trustee acknowledged that Plaintiffs issued the insurance policies described above. According to the settlement agreement, the Trustee agreed to accept $15.1 million as an exhaustion of policy limits "and as a complete compromise of all matters involving disputed issues of law and fact."  (Settlement Agreement, Dkt. [76-8] at 12.)  Moreover, the agreement specified that the $15.1 million payment would be funded in the following way:

> (1) $2 million under the 2009-10 Allied Policy;
>
> (2) $5 million under the 2009-10 Umbrella Policy;
>
> (3) $2 million under the 2010-11 Allied Policy;
>
> (4) $1.1 million under the 2010-11 AMCO Policy; and
>
> (5) $5 million under the 2010-11 Umbrella Policy.

(Settlement Agreement, Dkt. [76-8] at 14.)  Next, the agreement stated, "This

AO 72A
(Rev.8/82)

itemization is for accounting purposes only, it being the intent of the parties to exhaust the applicable limits of all the policies identified in the Recitals . . . ." (Id.)  In accordance with the settlement, Plaintiffs issued checks to Napa for the above amounts under each of those policies.  (See Dkt. [76-15].)

On April 11, 2012, the bankruptcy judge approved the settlement.  On April 18, 2012, she issued an order emphasizing that the agreement was binding on Allied, AMCO, and Napa only.  She expressly stated:

> nothing in this Order shall preclude the right of any non-settling party, including Bed Bath & Beyond, Inc., to assert any right, in a non-bankruptcy forum, to coverage under the Policies, or that the Settlement Amount does or does not represent the applicable limits of liability for payment of claims to which the Policies apply, provided, however, that the Insurers retain any right to assert that the limits under the Policies have been exhausted.

(Order Approving Settlement, Dkt. [76-14] ¶ 16.)

The day after the settlement was approved, Plaintiffs Allied and AMCO filed this declaratory judgment action against Defendants BBB and Arch seeking a declaration that their duty to defend BBB ended when they settled for the policy limits with the Napa Trustee.  BBB and Arch counterclaimed for a declaratory judgment that BBB is entitled to coverage under Plaintiffs' policies and that Plaintiffs still have a duty to defend BBB.  BBB has also brought a

7

claim for a bad faith penalty based on Plaintiffs' refusal to defend and

indemnify BBB.  Both sides seek summary judgment on their respective claims.

**Discussion**

**I.      Summary Judgment Legal Standard**

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  "The moving party bears 'the initial responsibility of informing the . . .

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact.' "  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259

(11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(internal quotations omitted)).  Where the moving party makes such a showing,

the burden shifts to the non-movant, who must go beyond the pleadings and

present affirmative evidence to show that a genuine issue of material fact does

exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

8

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

9

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist.  Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."  Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

## II.    Analysis[9]

As a threshold matter, Plaintiffs argue that Arch has no claim for relief because it has not paid any defense costs to BBB.  (Pls.' Br., Dkt. [76-1] at 4.) Defendants show that BBB exceeded its deductibles under the Arch Policy and demanded reimbursement from Arch on March 21, 2013.  (Second Decl. of Michael R. Friedenerg, Dkt. [86-5] ¶ 8.)  Defendants state that as of August 15, 2013, Arch had paid a total of $1,875,997 in defense and settlement costs.  (Id.

---

[9]Defendant BBB's Motion for Summary Judgment [80] adopted and incorporated by reference Defendant Arch's Statement of Material Facts and arguments in support of its Motion for Summary Judgment [75].  Also, the Court notes Plaintiffs' argument that it is entitled to summary judgment because BBB did not file its own responsive brief to Plaintiff's Motion for Summary Judgment [76]. (Pls.' Reply, Dkt. [90] at 1.)  In this case, however, Arch has made extensive arguments on behalf of BBB as its insurer, and BBB's rights are intertwined with Arch's.  Because the Court finds that Arch's arguments are fully responsive to Plaintiffs' claims against BBB, summary judgment against BBB is not warranted for this reason.

10

¶ 21.)  Consequently, Arch has standing to seek relief in this action.  See St. Paul Fire & Marine Ins. Co. v. Falley Forge Ins. Co., No. 1:06-CV-2074-JOF, 2009 WL 789612, at *10 (N.D. Ga. Mar. 23, 2009) ("Absent a right to contribution, an insurer has no incentive to perform its duty to defend when it knows that the insured has another primary insurer.").

The Court next addresses whether the policy limits were exhausted as a result of Plaintiffs' settlement with the Napa Trustee such that Plaintiffs' duties to BBB are terminated.  The Court will then determine whether Plaintiffs must reimburse Defendants for any defense costs incurred before or after the settlement.  Finally, the Court considers BBB's bad faith claim.

A.    Were the Relevant Policy Limits Exhausted?

As stated above, BBB was an additional insured on four of the five Allied and AMCO policies at issue in the bankruptcy proceeding.  The parties dispute (1) whether the increase from $5 million to $10 million of the 2010–2011 Umbrella Policy was rescinded as to BBB; (2) whether Allied and AMCO could terminate their duty to defend BBB by paying the policy amounts to the Napa Trustee; and (3) whether the limits of the four policies were in fact exhausted.

11

1.      **Rescission of the 2010-2011 Umbrella Policy Limits Increase**

Before considering exhaustion, the Court must resolve the parties' dispute over the validity of Napa's increase from $5 million to $10 million of the 2010–2011 Umbrella Policy.  According to Plaintiffs, the increase was rescinded under the settlement agreement, and thus BBB is bound by the rescission.  (Pl.'s Add'l SMF, Dkt. [83-2] ¶ 32; Pls.' Br., Dkt. [83] at 18.) Defendants contend that the increase still applies because the bankruptcy judge excepted BBB from any binding effect of the settlement, and in any event rescission is improper because Napa did not commit any fraud.  Because the bankruptcy judge expressly preserved BBB's right to assert additional coverage under the policies, the Court examines the merits of rescission.

Upon Napa's June 10, 2011 request for the $5 million increase, Plaintiffs' underwriter sent Napa's insurance broker an e-mail asking, "Please advise why the $10mil limit is requested/needed.  What has changed?"  (E-mail Correspondence, Dkt. [76-22] at 3.)  In response, Napa's insurance broker wrote, "Business is increasing and some of their business prospects are asking for higher limits.  They also recently landed a major contract with Bed Bath and

12

Beyond." (Id.) Plaintiffs accuse Napa of withholding material information about the numerous reports of injuries they had received, as well as neglecting to mention that Napa issued a precautionary hold on sales on June 12, 2011, the day before the increase went into effect. (Pls.' Br., Dkt. [76-1] at 12-17; Press Release, Dkt. [76-27].)

Defendants deny that Napa misrepresented any facts, citing an affidavit from Napa's former CEO, Gerald Cunningham, who states that Napa asked for the increase because of Napa's significant growth in business. (Cunningham Aff., Dkt. [86-3] ¶ 5.) He further states that while "there was an increase in the number of reports related to alleged injuries to property or person," he did not know whether any injured persons would file claims. (Id. ¶ 6.) Before Napa requested the increase, only one lawsuit had been filed in January or February 2011. (Id.) However, Mr. Cunningham acknowledged that "there was clearly a possibility of more claims resulting from increased usage in 2011." (Id.)

Under Georgia law,

Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:

(1) Fraudulent;

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

O.C.G.A. § 33-24-7(b).[10]

Defendants stress that the statements in Napa's e-mail were truthful and did not evidence any intent to deceive Plaintiffs.  Even so, the truth of Napa's statements is not determinative because Georgia courts do not distinguish between misrepresentations and omissions under the statute.  See Perkins v. Am. Int'l Specialty Lines Ins. Co., 486 B.R. 212, 218 (N.D. Ga. 2012) (collecting cases).  Therefore, if Napa supplied correct information while

---

[10]Defendants urge a narrow reading of the statute by arguing that it applies only to applications for insurance but does not address rescission of a policy increase. (Arch's Resp., Dkt. [86] at 11.)  O.C.G.A. § 33-24-7 is a broad statute that applies to "any application for an insurance policy . . . or in negotiations for such."  Id. § 33-24-7(a); see also Merritt v. Hub Int'l Sw. Agency, Ltd., No. 1:09-CV-00056-JEC, 2011 WL 4026651, at *6 (N.D. Ga. Sept. 12, 2011) (noting that the broad language of the statute permits rescission even when misrepresentations are not attached to a policy). The Court finds that pursuing an increase in policy limits falls within the meaning of "any application for an insurance policy," or "negotiations for such."

14

omitting material facts, there could still be a basis for rescission.  As for Napa's

intent, even if Napa had no intention of defrauding Plaintiffs, "it is immaterial

whether the applicant acted in good faith in completing the application" for the

purposes of rescission under O.C.G.A. § 33-24-7(b).  Taylor v. Ga. Int'l Life

Ins. Co., 427 S.E.2d 833, 834 (Ga. Ct. App. 1993). Putting aside whether

Napa's conduct rose to the level of fraud, the Court finds it sufficient to analyze

rescission under subparagraphs (b)(2) and (b)(3) of the statute.

> a.    *Rescission under O.C.G.A. § 33-24-7(b)(2)*

To show that an insured made a misrepresentation or omission that is

material to the acceptance of risk under subparagraph (b)(2), a plaintiff must

satisfy an objective standard by showing that the misrepresentation is "one that

would influence a *prudent insurer* in determining whether or not to accept the

risk, or in fixing a different amount of premium in the event of such

acceptance."  Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d

1331, 1340 (11th Cir. 2009) (emphasis in original) (quoting Lively v. S.

Heritage Ins. Co., 568 S.E.2d 98, 100 (Ga. Ct. App. 2002)) (internal quotation

marks omitted).  "Ordinarily it is a jury question as to whether a

misrepresentation is material, but where the evidence excludes every reasonable

inference except that it was material, it is a question of law for the court."

Perkins, 486 B.R. at 218 (quoting Taylor, 427 S.E.2d at 834) (internal quotation marks omitted).

The liability policies at issue required Napa not only to notify Plaintiffs of any suits brought against it, but also to notify them "as soon as practicable of an 'occurrence' or an offense that may result in a claim." (2009-10 Allied Policy, Dkt. [76-20] at 84.) An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 88.) Napa did not mention any occurrences when it requested the increase, and Defendants argue that at the time of the request, Plaintiffs were already defending one suit related to the Fuel Gel Products and had notice of a second claim. (Arch's Reply, Dkt. [89] at 11.) But after the additional coverage went into effect on June 13, 2011, Napa indicated in a June 17, 2011 letter through counsel that it was "in the process of gathering information regarding alleged incidents which have recently come to our client's attention," and then followed up on July 1, 2011, with a letter notifying Plaintiffs of over fifty incidents involving their products, including over two dozen that Napa became aware of between April 2010 and the date of the

16

increase request.  (Supplement to Notice of Occurrence, Dkt. [76-28].)

Therefore, Napa omitted reports of incidents involving its Fuel Gel Products

when it requested the $5 million increase.

Nevertheless, Defendants argue that Plaintiffs did not request information

about injuries or incidents involving the Fuel Gel Products and so Plaintiffs

cannot now contend that such information is material.  Generally, "an insurer

cannot assert that something is material unless it has either made inquiry about

or apprised its prospective insured of the need for proper disclosure of the

information in question."  Perkins, 486 B.R. at 219 (collecting cases).

Defendants attempt to invoke this rule by pointing out that Plaintiffs only asked

why the increase was being requested, not how many incidents had been

reported.  (Arch's Resp., Dkt. [86] at 15.)  That argument ignores the insurance

terms in place at the time.  Because Napa was already bound by the insurance

policy under which it sought expanded coverage, Napa was required to report

all potential claims or occurrences "as soon as practicable."  (See Pls.' Reply,

Dkt. [90] at 12 n.9.)  This provision expressly apprised Napa of the need to

properly disclose both current suits and incidents that could lead to liability.  In

view of this obligation, a reasonable insurer would find the omission of

17

information about potential claims material to an insured's request to increase coverage under the same policy.  Such information changes "the nature, extent, or character of the risk" of insuring Napa.  Taylor, 427 S.E.2d at 834 (quoting Davis v. John Hancock Mut. Life Ins., 413 S.E.2d 224, 226 (Ga. Ct. App. 1991)).  Defendants offer no evidence sufficient to create a genuine factual issue as to the materiality of this information.  Rescission is therefore proper under O.C.G.A. § 33-24-7(b)(2).

> b.    *Rescission under O.C.G.A. § 33-24-7(b)(3)*

The Court also finds that there is a basis for rescission under subparagraph (b)(3), which requires a plaintiff to show both an omission and that "the insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for."  O.C.G.A. § 33-24-7(b)(3).  In contrast to the objective inquiry under subparagraph (b)(3), this inquiry looks at whether the particular insurer would have increased the policy had it known the true facts.  See Home Indem. Co. v. Toombs, 910 F. Supp. 1569, 1576 (N.D. Ga. 1995).

18

The Court has already found that the omission was material, and the Court further finds that Plaintiffs have shown that they would not have approved the increase, or would not have approved it on the same terms, had it known of the reported incidents.  Notably, AMCO's underwriter testified in a deposition that knowledge of these claims and occurrences would have impacted AMCO's decision to increase the policy limits.  (Prettyman Depo., Dkt. [76-32] at 5-7.)  Indeed, on July 14, 2011, shortly after Napa informed Plaintiffs of the incidents, Plaintiffs told Napa that it was investigating grounds for rescission due to "the circumstances of the request for an increase in light of the numerous claims tendered to [Plaintiffs] for coverage immediately afterwards."  (Dkt. [76-5] at 7.)  Plaintiffs also noted that they would investigate whether material information was omitted from the underwriting process, and specifically planned to investigate "the extent to which Napa withheld knowledge of claims or occurrences at the time that it requested an increase in the limits."  (Id.)

This evidence demonstrates as a subjective matter that Plaintiffs would not have approved the increase on the same terms, if at all, had it known the extent of Napa's potential liability.  Defendants have not put forth any

19

testimony to the contrary, and thus rescission is also proper under subparagraph (b)(3).  See, e.g., Taylor, 427 S.E.2d at 834 (affirming grant of summary judgment where affidavit stating that insurance company would not have issued a policy had it known the true facts was not refuted); Home Indem. Co., 910 F. Supp. at 1577 (granting summary judgment when defendants did not controvert an affidavit stating that insurer "likely would have declined coverage" were it not for the misrepresentation).  Because the increase is properly rescinded, the policy limit for the 2010-11 Umbrella Policy is $5 million.

### 2.      Rights of an Additional Insured under the Allied Policies

As a legal matter, Defendants argue that "Plaintiffs should not be allowed to extinguish their duty to defend by paying an agreed amount to the bankruptcy trustee of one insured to distribute to the claimants of that insured and leave their other insured with no defense and no benefit from the settlement."  (Arch's Resp., Dkt. [86] at 20.)  Plaintiffs state that under Georgia law they are permitted to settle claims "in good faith . . . even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against the insurer."  Allstate Ins. Co. v. Evans, 409 S.E.2d 273, 274 (Ga. Ct. App. 1992).  Defendants counter that settling with some claimants over

20

others is distinguishable from a case between an insurer and an additional

insured because "an additional insured is entitled to the same protection as a

named insured." St. Paul Fire & Marine Ins. Co., 2009 WL 789612, at *8.

"Construction of an insurance policy is governed by the ordinary rules of

contract construction, and when the terms of a written contract are clear and

unambiguous, the court is to look to the contract alone to find the parties'

intent." BBL-McCarthy, LLC v. Baldwin Paving Co., 646 S.E.2d 682, 685

(Ga. Ct. App. 2007) (quoting Scottsdale Ins. Co. v. Great Am. Assur. Co., 610

S.E.2d 558, 560 (Ga. Ct. App. 2005)) (internal quotation marks omitted).

"[T]he insurer's undertaking with respect to the defense of the insured must be

determined by the particular contract of insurance between the parties."

Anderson v. U.S. Fid. & Guar. Co., 339 S.E.2d 660, 661 (Ga. Ct. App. 1986)

(quoting Liberty Mut. Ins. Co. v. Mead Corp., 131 S.E.2d 534, 535 (Ga. Ct.

App. 1963)).

Under the Allied insurance policies, Allied's duty to defend its insureds

ends "when [they] have used up the applicable limit of insurance in the payment

of judgments or settlements."  (2009-10 Allied Policy, Dkt. [75-3] at 58.)

Similarly, AMCO's duty to defend under the umbrella policies ends after

21

exhausting the limits by paying claims.  (2010-11 Umbrella Policy, Dkt. [75-8] at 13.)  The section of the Allied policies defining who is covered as an insured was modified to add BBB, while noting, "All terms and conditions of this policy apply unless modified by this endorsement."  (2009–10 Allied  Policy, Dkt. [75-3] at 98.)  Thus, the plain language of the agreement provides that Allied has no duty to defend either the primary or additional insureds once the policy limits are exhausted by paying settlements or judgments.  There is no language in the policy or the endorsement requiring the insurer to consider whether settlement would leave any of the additional insureds without coverage.  And while Defendants stress that "an additional insured is entitled to the same protection as a named insured," St. Paul Fire & Marine Ins. Co., 2009 WL 789612, at *8, an additional insured is not entitled to additional rights under an insurance contract, either.  See Bouboulis v. Scottsdale Ins. Co., 860 F. Supp. 2d 1364, 1373 (N.D. Ga. 2012) ("A third-party beneficiary has only those rights as granted to the parties under the contract and no greater." (citing Allstate Ins. Co. v. Sutton, 658 S.E.2d 909, 915-16 (Ga. Ct. App. 2008))).  It follows that if the policy limits are exhausted, Plaintiffs' duty to defend has ended as to all insureds.

22

This interpretation is consistent with Georgia law.  In <u>Allstate Insurance Co. v. Evans</u>, the Georgia Court of Appeals held that "[a] liability insurer may, in good faith and without notification to others, settle part of multiple claims against its insured even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against [the] insurer."  409 S.E.2d at 274 (alterations in original).  Although this case involves an additional insured seeking to enforce its insurer's duties, Defendants have not cited any Georgia cases holding that an additional insured retains rights under a policy even after the limits are exhausted.[11]  As the <u>Evans</u> court observed,

> Were the rule otherwise, an insurer would be precluded from settling any claims against its insured in such a situation [facing multiple suits] and would instead be required to await the reduction of all claims to judgment before paying any of them, no matter how favorable to its insured the terms of a proposed settlement might be.  Such a policy would obviously promote litigation and would also increase the likelihood, in many cases, that the insured would be left with a total adjudicated liability in excess of his policy limits.

---

[11]Defendants cite <u>BBL-McCarthy</u> in arguing "that a primary insurer could not terminate its duty to defend by tendering its remaining policy limits to an excess insurer."  (Arch's Summ. J. Br., Dkt. [75-2] at 11.)  However, in that case the insurance company tendered the amount of the policy limit to an excess insurer without a settlement or judgment, unlike here.  <u>BBL-McCarthy</u>, 646 S.E.2d at 687.  Moreover, the insurer conceded that it did not exhaust the policy limits by paying in this manner.  <u>Id.</u>

23

Id. Similarly, requiring an insurer to wait until all claims against its primary insured and additional insureds are reduced to judgment would undermine Georgia's policy favoring settlements. In sum, Georgia law does not prohibit an insurer from discharging its duty to defend, pursuant to the policy terms, even if additional insureds continue to face liability. Consequently, if Plaintiffs indeed "used up the applicable limit of insurance in the payment of judgments or settlements," their duty to defend is discharged. (2009-2010 Allied Policy, Dkt. [75-3] at 58.)

### 3.    Exhaustion

Finally, as a factual matter, the Court finds that Plaintiffs exhausted the policy limits of the four insurance policies that covered BBB as an additional insured. As Defendants argue, the bankruptcy judge did not intend for the settlement to determine BBB's rights. But by preserving BBB's rights to assert that the policy limits were not exhausted, the judge did not shield BBB from an ultimate finding of exhaustion. After all, she also preserved Plaintiffs' rights to argue exhaustion. "The term 'exhaust' as it applies to policy limits means the payment either of a settlement or of a judgment, which wholly depletes the

24

policy amount." <u>BBL-McCarthy</u>, 646 S.E.2d at 687.  Here, Plaintiffs issued

checks bearing each policy number to the Napa Trustee.  (<u>See</u> Dkt. [76-15].)

And even assuming that the initial allocation of funds in the settlement

agreement was arbitrary, as Defendants insist, ultimately four of the checks

were written on the policies covering BBB, each for the respective policy limit:

$2 million each for the 2009-10 and 2010-11 Allied Policies, and $5 million

each for the 2009-10 and 2010-11 Umbrella Policies.  (<u>Id.</u>)

Defendants point to <u>Anderson v. U.S. Fidelity & Guaranty Co.</u>, which

held that an insurer could not tender the applicable policy limits into the court

registry and thereby relieve itself of its duty to defend prior to any settlement or

entry of judgment against its insured.  339 S.E.2d at 661.  The court stated that

the language of the policy did not permit the insurer to satisfy its duty to defend

in this manner.  <u>Id.</u>  Here, by contrast, Plaintiffs paid the Napa Trustee pursuant

to a settlement approved by a bankruptcy judge.  Up until that point, Plaintiffs

had been ordered not to pay claimants, whose only recourse against Napa was

through the bankruptcy court.  In that vein, the settlement agreement provided

for the appointment of a neutral professional by the Napa Trustee to distribute

the insurance funds to claimants.  (Dkt. [76-8] § 2.1(b).)  The bankruptcy judge

also noted that "the settlement allows the Trustee to proceed with payment of [personal injury claims.]"  (Order Approving Settlement, Dkt. [76-14] ¶ 13.) Given the circumstances surrounding Napa's bankruptcy, the payment here constitutes a settlement within the meaning of the policy language and thus exhausted the policy amount.  The Court therefore concludes that under the terms of the insurance policies, Plaintiffs' payout of the policy limits terminated their duty to defend BBB.

      **B.**     <u>Do Defendants Have Any Right to Recover Defense Costs?</u>

Plaintiffs note that exhaustion does not necessarily relieve Plaintiffs of a duty to reimburse Defendants for defense costs incurred before exhaustion of the policy limits.  (Pls.' Br., Dkt. [76-1] at 17.)  But under the conflicting language of Plaintiffs' and Arch's respective primary insurance policies, Plaintiffs assert that the parties should share defense costs on a pro rata basis. (<u>Id.</u> at 18.)  Defendants argue that the Arch Policy is excess insurance to Allied's policies, and therefore Plaintiffs should reimburse all of BBB's defense costs and Arch's indemnity payments to BBB.  (Arch's Summ. J. Br., Dkt. [75-2] at 23.)

"Georgia caselaw indicates that, when two insurance policies covering the same risk both contain 'other insurance' clauses that cannot be reconciled, those clauses cancel each other out and the insurers share in liability pro rata." Am. Cas. Co. of Reading v. MAG Mut. Ins. Co., 185 F. App'x 921, 925 (11th Cir. 2006) (citing State Farm Fire & Cas. Co. v. Holton, 205 S.E.2d 872, 874 (Ga. Ct. App. 1974)).  In considering whether two clauses are reconcilable, "courts examine the language in the 'other insurance' clauses to determine whether each policy is primary or excess with respect to the covered claim." Graphic Arts Mut. Ins. Co. v. Essex Ins. Co., 465 F. Supp. 1290, 1294 (11th Cir. 2006).  If both policies here are excess policies with respect to the claims, then the clauses cannot be reconciled.

Turning to the "other insurance" provisions in the Allied policies, Plaintiffs note that their primary Allied policies are to be considered excess insurance if there is other insurance available:

a.    If, for injury or loss we cover, there is *other valid and collectible insurance available* to any insured under another policy:

(1)    Issued by another insurer, . . . *then this insurance provided by us shall be excess over such other insurance . . . .*

27

(Dkt. [75-3] at 84; Dkt. [75-5] at 93) (emphasis added).  Moreover, when the Allied policy is excess to another policy, Allied has no duty to defend.  (Dkt. [75-5] at 94.)

BBB's own liability policy issued by Arch also provides primary insurance with several exceptions, including the following:

(1) This insurance is excess over:

. . .

(b) *Any other primary insurance available* to you covering liability for damages arising out of the premises or operations, or the products and competed operations, *for which you have been added as an additional insured* by attachment of an endorsement.

(Dkt. [76-33] at 37) (emphasis added).  The Arch Policy also states that when it is excess, "we will have no duty . . . to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.' " (Id.)

These clauses cannot be reconciled.  The primary Arch Policy purports to be excess over any other primary insurance available.  Accordingly, in this situation the Arch Policy serves as excess insurance because the Allied primary policies provide "other primary insurance available to [BBB.]"  (Id.)  However,

28

the Allied policies are excess when there is "other valid and collectible

insurance available," and so Allied, too, is excess over Arch's "other valid and

collectible insurance" policy.  (Dkt. [75-3] at 84.)  In other words, both policies

are primary unless other insurance applies, in which case both are excess.[12]  It

follows that the clauses are irreconcilable.  See State Farm, 205 S.E.2d at 874

("Where . . . both insurers attempt to limit their liability to excess coverage 'if

there is other insurance,' then the clauses are irreconcilable, cancel each other

out, and the liability is to be divided equally between them."); St. Paul Fire &

Marine Ins. Co., 2009 WL 789612, at *4 ("Excess provisions are irreconcilable,

regardless of how they are written, if 'both policies in question provide that if

there be other insurance, each shall be responsible only for excess over any

other valid and collectible insurance.' " (quoting Am. Cas. Co., 185 F. App'x at

927)).  Therefore, the parties must share with Defendants, on a pro rata basis,

---

[12] Arch attempts to reconcile the policies by construing the Arch Policy as "a policy providing excess coverage."  (Arch Summ. J. Br., Dkt. [75-2] at 23.)  More accurately, the Arch Policy is a primary policy that is only excess if other primary insurance is available.  When two primary policies covering the same risk attempt to become excess in the event that other insurance is available, it is improper to reconcile them by construing one as primary and the other as excess.  See Am. Cas. Co., 185 F. App'x at 927 (holding that "excess clauses cancel each other out" when "[e]ach clause plainly attempts . . . to shift primary liability to the 'other insurance,' that is, the other policy").

any covered cost of defending BBB that was incurred before the exhaustion of the policy limits on May 3, 2012.  (See Pls.' SMF, Dkt. [76-2] ¶ 13.)

C.      BBB's Bad Faith Claim

Defendants argue that Plaintiffs acted in bad faith when they did not extend the same protection to BBB as it did to its primary insured.  Under O.C.G.A. § 33-4-6,

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer . . . and all reasonable attorney's fees for the prosecution of the action against the insurer . . . .

Id. § 33-4-6(a).  "As the statute imposes a penalty, it is strictly construed." Primerica Life Ins. Co. v. Humfleet, 458 S.E.2d 908, 910 (Ga. Ct. App. 1995).

"The insured bears the burden of proving bad faith, which is defined as 'any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy.' " Fortson v. Cotton States Mut. Ins. Co., 308 S.E.2d 382, 385 (Ga. Ct. App. 1983) (quoting Royal Ins. Co. v. Cohen, 125 S.E.2d 709, 711 (Ga. Ct. App. 1962)).

30

The sole basis Defendants rely on for their bad faith claim is that Plaintiffs treated BBB differently from the primary insured by leaving it without any coverage under their policies.  (Arch's Summ. J. Br., Dkt. [75-2] at 19.)  As discussed in Part II.A.2, <u>supra</u>, this argument is without merit.  In addition, despite the Court's finding that Plaintiffs must pay a pro rata share of any defense costs incurred before exhaustion, Plaintiffs' previous refusal to pay was not in bad faith because Plaintiffs had reasonable grounds to contest coverage.  <u>See</u> <u>Moon v. Cincinnati Ins. Co.</u>, 666 S.E.2d 387, 396 (Ga. Ct. App. 2008) (holding that when "insurer has reasonable grounds to contest the claim, no penalty should be permitted" (citation omitted)).  As such, Defendants are not entitled to a bad faith penalty.

**Conclusion**

For the foregoing reasons, the Court finds as follows:

1.  The $5 million increase of the 2010-11 Umbrella Policy amount is rescinded as to BBB, effective June 13, 2011;

2.  Plaintiffs' duty to defend BBB was discharged upon the May 3, 2011 payment to the Napa Trustee, which exhausted the policy limits under the 2009-10 Allied Policy, the 2010-11 Allied

31

Policy, the 2009-10 Umbrella Policy, and the 2010-11 Umbrella

Policy;

3.      Because the excess clauses in the insurance policies are

irreconcilable, the parties shall split, on a pro rata basis, any

covered defense costs that BBB or Arch incurred prior to the

exhaustion of the policy limits; and

4.      BBB's counterclaim for bad faith is due to be **DISMISSED**.

Accordingly, Plaintiffs Allied Property and Casualty Insurance Company

and AMCO Insurance Company's Motion for Summary Judgment [76] is

**GRANTED**, and Defendant Arch Insurance Company's Motion for Summary

Judgment [75] and Defendant Bed Bath and Beyond's Motion for Summary

Judgment [80] are **DENIED**.

The case is **STAYED** for thirty (30) days, during which the parties shall

endeavor to negotiate a resolution of the amount of defense costs owed to BBB

and Arch.  In that regard, the parties shall report their progress to the Court by

filing a joint status report within thirty (30) days of the date of this Order.

**SO ORDERED**, this  31st  day of March, 2014.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)